IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

CHAD REDDELL, )
 )
    Plaintiff, )
 )
v. ) Case No. 12-CV-379-JED-FHM
 )
JERRY GAMMILL, Individually and )
in his Official Capacity as District )
Manager of Rural Water District No. 3, )
Washington County, Oklahoma, and )
DOUG STICKLES, Individually and in )
his Official Capacity as Field Supervisor )
of Rural Water District No. 3, )
Washington County, Oklahoma )
 )
    Defendants. )

## OPINION AND ORDER

**I.   Background[1]**

On July 9, 2010, Plaintiff was injured when he fell while working on the roof of an old water filter building owned by Rural Water District No. 3, Washington County (RWD3). At all pertinent times, Plaintiff was employed as a meter reader with RWD3. Plaintiff was directly supervised by Defendant Doug Stickles, a field supervisor. Defendant Jerry Gammill is the district manager and head of RWD3.

In approximately July 2010, Gammill determined that some old water filter structures owned by RWD3 in rural Washington County should be torn down because they were out of use and had become an "eyesore." (Stickles Dep. at 29:9-12, Doc. 96-2). Gammill conveyed this

---

[1] The following facts are supported by evidence in the record and are construed in favor of Plaintiff, the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

1

decision to Stickles, who assigned the task to a crew consisting of Plaintiff, Tim Dunagan, and Justin Newman. The structures to be removed included a water filter building that was approximately thirty feet tall, with walls made from concrete and metal and a roof made of metal or tin on an iron framework, and several other structures surrounding the building.

In addition to reading water meters, Plaintiff and other meter readers were sometimes asked to do simple tasks related to upkeep, such as fixing water leaks, painting or oiling fire hydrants, and weed-eating. However, this was the first time any of the crew members for this assignment had been asked to take down a building. Plaintiff contends that he and the other crew members complained to Stickles that they were not trained to tear down buildings and that they were concerned about safety. The crew began the assignment by using a cutting torch to tear down various structures surrounding the filter building. As the crew began removing these structures, Plaintiff requested a lift for safety but was provided only with a backhoe. When Plaintiff advised Stickles that the backhoe was unsafe and a lift was needed, Stickles said, "it's there, use it." (Reddell Dep. at 47:14-20, Doc. 96-1). The crew requested and was provided with safety glasses and respiratory masks, and gloves and ladders were available for their use.

Plaintiff asked Stickles on several occasions about obtaining a lift to safely reach the highest parts of the filter building. Plaintiff asserts that Stickles told Plaintiff that he would try to borrow a lift but that Plaintiff needed to continue the work with the equipment available. (Doc. 96 at 13). One morning before the crew began tearing down the water filter building, Plaintiff asked about the status of the lift in the presence of both Stickles and Gammill, explaining that "it would be safer if we used a lift." (Reddell Dep. at 53:16-54:11, Doc. 86-1). Stickles told Plaintiff that he was "working on it." (*Id.*) Plaintiff also spoke directly to Gammill on one occasion about obtaining a lift and other safety equipment, but Plaintiff did not specifically complain to Gammill

about the deconstruction project. (Doc. 96 at 6). Gammill understood that a lift was needed for removal of the roof due to the potential dangers posed by the height of the roof. (Doc. 103 at 6).

After the other structures on the site had been torn down with the cutting torch, the crew had to move on to tearing down the filter building. (Doc. 96 at 12-13). Plaintiff was not provided with any training or instructions on how to deconstruct the filter building. Stickles testified that he believed it was "common sense" and "pretty self-explanatory how to take screws out of a building." (Stickles Dep. at 57:23-58:4, Doc. 96-2). Prior to starting deconstruction of the building, Plaintiff again asked for a lift. (*Id.* at 13). Gammill and Stickles both testified that they believed the equipment provided was sufficient for removing the sides of the building but that a lift was needed to remove the roof safely.

Plaintiff, Dunagan, and Newman began deconstructing the building by removing the tin on the sides. Dunagan and Newman took turns holding a ladder while Plaintiff removed the screws holding the tin sides to the metal frame. Plaintiff testified that he asked Dunagan and Newman to get onto the roof but that they refused, both because they were afraid of heights and did not think the roof would support their weight. (Reddell Dep. at 61:16-21, Doc. 86-1; *id.* at 69:11-18).

One day when Stickles visited the site, Plaintiff was on the roof and the crew had removed the tin from one side of the building. Plaintiff told Stickles that the crew could not remove one side of the building because the top row of screws was underneath the roof. Stickles responded, "Well, remove it how you need to." (Reddell Dep. at 59:11-16, Doc. 96-1). Plaintiff told Stickles, "Well, that means we have to remove the roof," and Stickles responded, "Okay." (*Id.* at 59:17-20). As Stickles was walking off, he commented, "Don't fall." (*Id.*). Plaintiff testified that he had asked Stickles about the status of the lift earlier that morning and was told that Stickles "was waiting to borrow one." (Reddell Dep. at 60:4-8, Doc. 96-1). Plaintiff testified that he had "asked

3

[Stickles] at the beginning of that day what he wanted us to do, knowing the task at hand, and [Stickles] said, Go out there and do the job. And he knew what we were getting ready to do." (Reddell Dep. at 62:20-25, Doc. 96-1).

On July 9, 2010, Plaintiff fell from the building's roof to the concrete slab thirty feet below, causing serious and permanent injuries. Plaintiff was put in an induced coma and remained in the hospital for several weeks after his fall. (Doc. 96 at 13). Plaintiff returned to work for RWD3 after recovering from his initial injuries but testified that he had to resign shortly thereafter because Gammill and Stickles treated him rudely and unfairly and forced him to do jobs that caused him severe pain and discomfort due to his injuries. (*Id.* at 13-14).

In his investigation of the incident, Gammill learned that Stickles knew, before the accident, that Plaintiff was on the roof without a lift or safety harness. (Gammill Dep. at 17:22-24, Doc. 96-3; *id.* at 28:5-11). Stickles was not written up or disciplined by RWD3 despite having Reddell work on the roof without the proper safety equipment. (*Id.* at 28:5-15). Gammill testified that he is not critical of anything Stickles did or did not do relating to tearing down the water facility. (*Id.* at 40:21-41:7).

On July 9, 2012, Plaintiff filed this lawsuit, asserting claims under 42 U.S.C. § 1983 for violation of his constitutional rights against Gammill and Stickles in their individual and official capacities, and for municipal liability pursuant to 42 U.S.C. § 1983 against Gammill in his official capacity. Gammill and Stickles move for summary judgment. (Docs. 86, 87). RWD3 is a Rural Water District governed by the Rural Water, Sewer, Gas and Solid Waste Management Districts Act, 82 Okla. Stat. § 1324.1 *et seq.*, and is therefore a political subdivision of the State of Oklahoma. Gammill and Stickles each assert entitlement to the defense of qualified immunity.

## II. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The courts thus determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255.

## III. Discussion

### A. Individual Liability

Plaintiff asserts claims under § 1983 against Gammill and Stickles each in their individual capacities based on their alleged deliberate indifference to his health and safety. "Under the qualified-immunity doctrine a public officer or employee is subject to liability only for violating a federal constitutional or statutory right that was clearly established at the time of the violation." *Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1266 (10th Cir. 2013). Government officials are shielded from liability if their actions did not violate clearly established federal rights "of which a reasonable person would have known." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). In resolving questions of § 1983 qualified immunity at the summary judgment stage, courts engage in a two-pronged inquiry. The first prong "asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right.'" *Tolan*, 572 U.S. at 655-56 (quoting *Saucier v. Katz*, 533 U.S.

5

194, 201 (2001)). The second prong asks "whether the federal right was clearly established at the time of the violation." *Id.* at 656 (quoting *Pelzer*, 536 U.S. at 739). Courts have discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Once a defendant invokes qualified immunity in a motion for summary judgment, the plaintiff "must produce facts 'sufficient to show both that the defendant's alleged conduct violated the law and that the law was clearly established when the alleged violation occurred.'" *Bruning v. Pixler*, 949 F.2d 352, 356 (10th Cir. 1991) (quoting *Pueblo Neighborhood Health Cntrs. Inc. v. Losavio*, 847 F.2d 642, 646 (10th Cir. 1988)); *see also Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). This is a "'heavy, two-part burden' that the plaintiff must meet," and "[f]ailure on either element is fatal to the plaintiff's claims." *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015) (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)). However, the general summary judgment standards apply to motions for summary judgment based on qualified immunity, and courts accordingly must still view the evidence in the light most favorable to the non-moving party. *See Tolan*, 572 U.S. at 656-60; *Scott v. Harris*, 550 U.S. 372, 377 (2007).

   1.   **Violation of a Constitutional Right**

To evaluate a claim of qualified immunity against § 1983 claims, a court must "determine whether a plaintiff 'has asserted a violation of a constitutional right at all.'" *Moore v. Guthrie*, 438 F.3d 1036, 1040 (10th Cir. 2006) (citing *Siegert v. Gilley*, 500 U.S. 226, 231 (1991)). The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const., Am. 14, § 1. "The Supreme Court has recognized a liberty interest in bodily integrity in only very limited circumstances involving such

things as abortions and instances where individuals are subject to dangerous or invasive procedures where their personal liberty is being restrained." *Moore*, 438 F.3d at 1039 (internal citations omitted).

"Due process protection has historically been applied to deliberate decisions of government officials to deprive a person of life, liberty, or property." *Id.* at 1040 (internal citation and alterations omitted). However, this provision does not guarantee a safe work environment. *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992). As the Tenth Circuit explained in *Moore*,

> The Supreme Court . . . has declined to extend due process protection to safe working conditions[, and has held] that substantive due process was not a guarantor of workplace safety: "Neither the text nor the history of the Due Process Clause supports petitioner's claim that the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause." . . . The "ultimate" standard for determining whether there has been a substantive due process violation is "whether the challenged government action shocks the conscience of federal judges." It is well settled that negligence is not sufficient to shock the conscience. In addition, "'a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power.'" "Even knowingly permitting unreasonable risks to continue does not necessarily rise to the level of conscience shocking."

*Moore*, 438 F.3d at 1040 (internal citations omitted). Accordingly, as Plaintiff acknowledges, neither his status as a government employee, nor the fact that the alleged acts occurred while he was working, is relevant to whether his constitutional rights were violated. Rather, Plaintiff contends that Defendants were deliberately indifferent to Plaintiff's health and safety by ignoring Plaintiff's and other employees' safety concerns, refusing to provide necessary safety equipment for the task, and requiring Plaintiff to tear down the abandoned building.

The Tenth Circuit has explained that the Due Process Clause is "not a guarantee against incorrect or ill-advised government decisions." *Hernandez v. Ridley,* 734 F.3d 1254, 1261 (10th Cir. 2013). "[O]nly the most egregious official conduct can be said to be arbitrary in the

constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (internal quotation marks omitted); *see also Hernandez,* 734 F.3d at 1261 ("To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or employed it as an instrument of oppression." (internal quotation and alterations omitted)). In determining whether government conduct rises to the conscience-shocking level, courts "'must bear in mind three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety.'" *Moore*, 438 F.3d at 1040-41 (quoting *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995)).

Plaintiff relies principally on *Sherwood v. Oklahoma County*, an unpublished Tenth Circuit decision.[2] *Sherwood v. Okla. Cty.*, 42 F. App'x 353 (10th Cir. 2002) (unpublished). In *Sherwood*, a maintenance worker for a county sheriff's department was assigned to repaint the department's fleet of vehicles. *Id.* at *355-56. Before painting commenced, the planned painting operation was shut down by the county health and safety department because the county did not have a proper spray paint booth. The sheriff then ordered the construction of a makeshift paint booth, but no one involved in constructing the booth discussed proper ventilation, even though ventilation was one of the reasons the original operation was shut down. *Id.* at *355. The sheriff's office was notified by authorities that the makeshift paint booth was dangerous to workers and did not comply with applicable workplace safety or environmental regulations. In response, the sheriff advised the

---

[2] Under 10th Cir. R. 32.1, unpublished decisions are not precedential but may be cited for their persuasive value.

county health department that it would not continue spray-painting vehicles. *Id.* at *355-56. However, less than a year later, defendants ordered the plaintiff to supervise inmates in painting the vehicles in the makeshift booth and threatened the plaintiff with discharge if he did not complete the project. *Id.* No steps were taken to ensure compliance with the applicable health and safety regulations, and the painting operation was performed without any ventilation or safety equipment. *Id.* The paint used was highly toxic and allegedly caused serious health consequences to the plaintiff and others who performed the work. *Id.*

The court in *Sherwood* concluded that summary judgment was improperly granted, finding that the plaintiff had "pled facts which are sufficient to allow the question of [the defendants'] conduct to go before a jury [because] the law recognizes a constitutional violation based on deliberate indifference where defendants create a dangerous situation, enjoy the luxury of making an unhurried judgment, have the chance for repeated reflection largely uncomplicated by competing obligations, and nevertheless taking action which at 'best sanctions, at worst intends' plaintiff's injury." *Id.* at *359 (internal alterations and citation omitted). The court emphasized that the defendants "had over a year to contemplate their actions and the consequences of their conduct." *Id.* The court also noted that "Plaintiff was in a classic lose/lose situation" because he was ordered to perform the painting operation without ventilation or safety equipment, and his "employment and his right to work and earn a living were threatened by those with authority over him if he failed to comply . . . ." *Id.* at *358. As a result, there were facts from which a reasonable jury could find the defendants' "behavior was egregious, outrageous and recklessly indifferent to the serious consequences imposed on [the plaintiff]." *Id.* at *359-60.

Plaintiff also cites a case from a district court outside the Tenth Circuit, in which an employee of a local water and power authority suffered severe burns from electricity while

9

attempting to change a switch near high-voltage power lines. *Eddy v. Virgin Islands Water and Power Auth'y*, 955 F. Supp. 468 (D.V.I.), *reconsideration granted in part*, 961 F. Supp. 113 (D.V.I. 1997). The plaintiff alleged that he was a lineman who had not been trained or qualified to do such work. Earlier, the authority's supervisor of electricians had refused to allow any of the electricians under his supervision to perform the work because the switch was energized with over 14,000 volts of electricity. 955 F. Supp. at 471. Rather than waiting until the switch could be de-energized and replaced safely, plaintiff's supervisor instructed him to change the switch, threatening him with disciplinary action if he refused. *Id.* The plaintiff had previously been suspended and had been "threatened, intimidated, and harassed" on multiple occasions for refusing or questioning job assignments out of safety concerns. *Id.* The court held that the allegations were sufficiently conscience-shocking to survive a motion to dismiss. *Id.* at 475.

Here, Plaintiff contends that Defendants compelled the crew to take down the water filter building, knowing that there was no way to complete the work without getting on the roof. Plaintiff testified in his deposition that he feared being terminated if he did not do the job. (Reddell Dep. at 63:8-10, Doc. 96-1). However, Plaintiff testified that he was not ordered to get on the roof, nor did anyone tell him he would lose his job if he did not do so. (*Id.* at 64:4-8). Further, it is undisputed that Plaintiff's fellow crew members, Dunagan and Newman, did not get on the roof because they were bigger than Plaintiff. When Plaintiff was asked why he believed he would be terminated if he did not get on the roof, but Dunagan and Newman would not, he said "I don't know. That's just . . . my thought process." (Doc. 103-1 at 63:23-64:4).

Plaintiff does not provide any further evidence suggesting that his job was threatened if he failed to complete the assignment without the use of a lift. In fact, Plaintiff testified that he understood Stickles was trying to borrow a lift for the crew, and he admits the project was not a

rushed project. (Reddell Dep. at 57:10-16, Doc. 86-1; Doc. 96 at 8).[3] Furthermore, unlike the plaintiff in *Eddy*, Reddell had never been disciplined prior to his accident. (Doc. 96 at 14). Plaintiff's evidence does not support a reasonable inference that Plaintiff had no choice but to climb onto the roof to remove it or face the loss of his job; Plaintiff was not in the type of "lose/lose situation" faced by the plaintiff in *Sherwood*. 42 F. App'x at *358.

Plaintiff also contends that he had no choice but to climb onto the roof because Defendants refused to provide a lift. The Court notes Plaintiff's deposition testimony that Stickles instructed him to use a backhoe instead of a lift when tearing down the structures on the water filter site other than the building. (Reddell Dep. at 47:3-20, Doc. 96-1). However, it is undisputed that Stickles told Plaintiff on multiple occasions that he would try to borrow a lift for deconstruction of the building. (S*ee* Doc. 96 at 13). Plaintiff also testified that after the crew had begun removing the tin sides of the filter building, he again asked Stickles for a lift and was told Stickles was working on it. (Reddell Dep. at 53:15-54:17, Doc. 96-1). Plaintiff argues that Stickles merely paid "lip service" to his intention to borrow a lift did not actually intend to do so. (Doc. 96 at 6-7). In support, Plaintiff cites his own testimony that Stickles knew Plaintiff was on the roof of the filter

---

[3] Plaintiff contends the length of time Defendants had to consider their actions suggests deliberate indifference. "While length of deliberation may be a factor in a conscience-shocking analysis, . . . . it cannot replace the over-arching need for deference to local policy-making bodies. Were this not so and any long-deliberated decision (resulting in a later injury) were called conscience-shocking, substantive due process violations would become a substantial and unnecessary substitute to state tort law." *Moore*, 438 F.3d at 1041 n.1 (citing *Lewis*, 523 U.S. at 853). While the Tenth Circuit in *Sherwood* noted the defendants' "luxury of making an unhurried judgment" as a factor suggesting deliberate indifference, in that case the defendants "had over a year to contemplate their actions and the consequences of their conduct." 42 F. App'x at *359. Plaintiff has not presented any evidence suggesting a year or more elapsed between his request for a lift and his injury. Accordingly, Defendants' time for deliberation in this case does not indicate deliberate indifference.

building without a lift and told him to "remove [the roof] how you need to." (*Id.* (citing Reddell Dep. at 59:7-21, Doc. 96-1)). However, Plaintiff also testified that Stickles had told him earlier that morning that he "was waiting to borrow [a lift]," and that Plaintiff did not ask Stickles about the lift when Stickles visited the work site. (Reddell Dep. at 60:4-8, Doc. 96-1). Plaintiff has not presented any evidence that either Gammill or Stickles actually made a decision not to obtain a lift, or that Plaintiff was told of any such decision.

Plaintiff emphasizes Stickles' "authority and control over the deconstruction of the abandoned water facility, including the implementation of safety precautions." (Doc. 96 at 20). However, as noted above, Plaintiff testified that no one ordered him to get on the roof and no one told him he would lose his job for refusing to do so. Plaintiff has failed to produce sufficient evidence for a reasonable jury to find that Plaintiff was required to climb onto the roof of the filter building before a lift was obtained.

Accordingly, Plaintiff has not established that Defendants' conduct was comparable to the conduct that courts found conscience-shocking in *Sherwood* and *Eddy*. Instead, as in *Collins*, plaintiff's claim "is analogous to a fairly typical state-law tort claim: the city breached its duty of care to [him] by failing to provide a safe work environment." *Collins*, 503 U.S. at 128 (holding that city's alleged failure to train its employees or to warn about known hazards of working in sewers could not "properly be characterized as arbitrary, or conscience-shocking, in a constitutional sense"); *see also Moore*, 438 F.3d at 1041 (holding that police chief's directive that officers wear riot helmets during firearms training exercise, rather than ammunition manufacturer's protective face mask, did not constitute deliberate indifference). The Supreme Court has "rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law." *Moore*, 438 F.3d at

1041 (citing *Collins*, 503 U.S. at 128). Plaintiff has not established a genuine issue of material fact as to whether Defendants' conduct was conscience-shocking, and accordingly, he has not met his burden under the qualified immunity doctrine to show a violation of his constitutional rights.

Plaintiff further asserts that Defendant Gammill is individually liable on a theory of supervisory liability for inadequate training and supervision amounting to deliberate indifference to Plaintiff's health and safety. "[I]n a § 1983 lawsuit, supervisory liability allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, or implements a policy which subjects, or causes to be subjected that plaintiff to the deprivation of any rights secured by the Constitution." *Cox v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015) (internal quotation marks and alterations omitted) (citing *Brown v. Montoya,* 662 F.3d 1152, 1163–64 (10th Cir. 2011)). "This does not equate to "liability under a theory of *respondeat superior*." *Id.* (citing *Brown*, 662 F.3d at 1164; *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013)). Under this theory, a plaintiff must show "an affirmative link between the supervisor and the constitutional violation." *Id.* (internal quotation omitted). However, because Plaintiff has not met his burden to show a violation of his constitutional rights, he cannot succeed on theory of § 1983 supervisory liability against Gammill. In addition, the record evidence does not establish that Gammill promulgated or implemented any policy that subjected Plaintiff to a constitutional violation.

2. **Clearly Established Right**

Even if Plaintiff had shown the violation of a constitutional right, he must also show the right was clearly established at the time of the Defendants' conduct. As the Tenth Circuit explained in *Clark v. Wilson*, 625 F.3d 686 (10th Cir. 2010), "'[o]rdinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the

13

clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'" 625 F.3d at 690 (quoting *Zia Trust Co. ex rel. Causey v. Montoya,* 597 F.3d 1150, 1155 (10th Cir. 2010) (internal quotation omitted)). The relevant inquiry is "'whether the law put officials on fair notice that the described conduct was unconstitutional.'" *Id.* (quoting *Casey v. City of Fed. Heights,* 509 F.3d 1278, 1284 (10th Cir. 2007) (quotations omitted)). "The contours of the right must be 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Anderson v. Blake*, 469 F.3d 910, 913 (10th Cir. 2006) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

Plaintiff contends that "the constitutional right at issue is a public employee's right to not be put in danger by a government employer." (Doc. 96 at 26). However, under *Collins* and *Moore*, which were extant at the time of Plaintiff's injury, it was clearly established that there is no substantive due process right to a safe work environment. *See Collins*, 503 U.S. at 126; *Moore*, 438 F.3d at 1040. Rather, in this context due process protection extends only to conduct that shocks the conscience. *See Moore*, 483 F.3d at 1040. Plaintiff has not pointed to any law that was sufficiently clear as of the date of his injury to put Gammill and Stickles on notice that their conduct was unconstitutional. Because Plaintiff has not met his burden to establish a genuine issue of fact as to whether Gammill or Stickles placed him in danger in a conscience-shocking manner, Plaintiff has not shown that Defendants violated any right that was clearly established at the time.

### 3. Conclusion

For the reasons set forth above, Plaintiff has failed to satisfy his burden to show that Stickles' or Gammill's conduct violated his Fourteenth Amendment substantive due process rights or that, at the time of his injury, clearly established law put Defendants on notice that their conduct

violated the constitution. Stickles and Gammill therefore are entitled to summary judgment as to Plaintiff's § 1983 claims asserted against them in their individual capacities.

B.     **Municipal Liability[4]**

Pursuant to *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), Plaintiff's official-capacity claims against Gammill and Stickles are treated as claims against RWD3. A municipality may not be held liable under § 1983 solely because its employee inflicted injury; municipal liability cannot be found by application of the theory of *respondeat superior*. *Monell*, 436 U.S. at 694. "[L]ocal governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). To hold a municipality liable under § 1983, a plaintiff must prove (1) the existence of a municipal policy or custom by which the plaintiff was denied a constitutional right and (2) that the policy or custom was the moving force behind the constitutional deprivation. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell*, 436 U.S. at 694. The requirement of a policy or custom distinguishes the "acts of the municipality from acts of employees of the municipality, and thereby make[s] clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479. The Tenth Circuit has described several types of actions which may constitute a municipal policy or custom:

> A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice

---

[4] In his Motion for Summary Judgment, Stickles purports to assert qualified immunity "in his official capacity" as well as in his individual capacity. (Doc. 87 at 4.) As the Court noted in its order denying defendants' Motion to Dismiss, a suit against a person in his official capacity is treated as a suit against the municipal entity. (*See* Doc. 25 at 8.) The doctrine of qualified immunity is inapplicable to such claims. *Camuglia v. The City of Albuquerque*, 448 F.3d 1214, 1223 (10th Cir. 2006) ("Only individuals, not municipalities, are protected by qualified immunity.").

that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

Plaintiff contends that Gammill failed to adopt and implement adequate policies and/or customs, practices, or guidelines as to the safety of employees; failed to adequately supervise Stickles while allowing him to direct employees to work in dangerous conditions; and ratified the decisions of Stickles. Plaintiff also contends that Stickles' actions create independent grounds for municipal liability because Gammill had delegated full decision-making authority to Stickles for the deconstruction project. However, as set forth above, Plaintiff has not met his burden to establish a violation of his constitutional rights. Consequently, Plaintiff cannot succeed on his municipal liability claims arising from the same facts. *See, e.g., Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993) ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers."); *Camuglia*, 448 F.3d at 1223 (determining City was also entitled to summary judgment where the court determined that there had been no underlying constitutional violation). Gammill and Stickles therefore are entitled to summary judgment as to Plaintiff's official-capacity claims.

## IV. Conclusion

For the foregoing reasons, Defendants' Motions for Summary Judgment (Docs. 86, 87) are **granted**. A separate Judgment will be entered forthwith.

**SO ORDERED** on this 28th day of June, 2019.

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT